CASE 98—ACTION TO BE ALLOWED TO REDEEM CERTAIN SHARES OF
STOCK, CLAIMED TO HAVE BEEN PLEDGED TO DEFENDANT'S TESTA-
TOR—JUNE 14.

# Cunningham v. Jones' Exrs.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

JUDGMENT FOR DEFENDANTS AND PLAINTIFF APPEALS. AFFIRMED.

PLEDGES—SALE BY PLEDGOR TO PLEDGEE—EXTINGUISHMENT OF RIGHT
TO REDEEM.

Held: Where the pledgee of shares of stock surrendered to the
pledgor a paper evidencing the pledge, and also surrendered the
notes to secure which the pledge was made, marking them "paid,"
and the pledgor executed and delivered to the pledgee an abso-
lute bill of sale of the shares, the chancellor will not, in the ab-
sence of strong evidence of fraud, set aside the contract and per-
mit the pledgor to redeem.

W. S. PRYOR, D. W. SANDERS AND DODD & DODD, ATTORNEYS FOR
APPELLANT.

1. That necessitous men are in a measure not free men, and where
a pledgee, by the influence of his encumbrance, acquires from
the pledgor his equity of redemption, courts of equity will not
hesitate to set the transaction aside when asked to do so by the
oppressed debtor, unless it be affirmatively shown by the pledgee
that the transaction was a fair one and was made upon an ade-
quate consideration. The pledgee, having already the possession
of and legal title to the stock certificates, comes into every new
transaction with the pledgor with increased advantage. In
order to attain the ends of justice and prevent fraud and oppres-
sion, every doubt should be resolved in favor of the pledgor's
right to redeem the stock, because the pledgee is thereby fully
protected and secured in the payment of his debt and interest.
Perkins v. Drye, 3 Dana, 170; Honore v. Hutchins, 8 Bush, 695;
Price v. Thompson, 84 Ky., 226; Hart v. Burton, 7 J. J. Mar-
shall, 323; Goodin v. Canal Co., 18 Ohio St., 183.
2. The fact that the real transaction between the parties was a bor-
rowing and lending of money, on the pledge of the stock as se-
curity, will, whenever or however it shall appear, show that
a deed, absolute on its face, was intended as a security for the

money; and whenever it can be ascertained to be a security for money, it is only a pledge or mortgage, however artfully it may be disguised, and the pledgor can redeem upon the payment of that debt and interest. Edrington v. Harper, 3 J. J. Marshall, 365; Bright v. Wagle, 3 Dana, 253; Skinner v. Miller, 5 Litt., 86; Honore v. Hutchins, 8 Bush., 695; Villa v. Rodriguez, 12 Wall., 339.

3. It is not material that the said Jones retained no other security or evidence for what appellant owed him than the stock itself, nor, in case the stock depreciated in value, that it was optional with appellant whether he would pay or not, and if he failed to pay, that Jones might have been without remedy to collect from him the deficit.

Jones admitted in his deposition that he knew at the time that appellant was in harassed and straitened financial circumstances, and that he did not give him a cent for the equity of redemption. The circumstance that he surrendered the notes is neither conclusive nor formidable, as has often been held by the authorities. Honore v. Hutchins, 8 Bush, 695; Perkins v. Drye, 3 Dana, 177; Hyndman v. Hyndman, 19 Vt. 9. (Same case, 46 Am. Dec., 171); Turnipseed v. Cunningham, 16 Ala., 503.

4. To give validity to such a sale by pledgor to pledgee, it must be shown that the conduct of the pledgee was, in all things, fair and frank, and that he paid for the property all that it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or hopes of the pledgor. Where confidential relations and the means of oppression exist, the scrutiny is even severer. The form of the instruments employed is immaterial. That the pledgor knowingly surrendered, and never intended to reclaim, is of no consequence. Public policy, sound morals, and the protection due to those whose property is thus involved, require that such shall be the law. Villa v. Rodriguez, 12 Wall., 339; Easton v. German American Bank, 127 U. S., 536; Russell v. Southard, 12 How., 139; Peugh v. Davis, 96 U. S., 336.

5. That Jones owed a duty to appellant to get for the said stock its full value, and was *disqualified* from purchasing from himself. The ground on which this *disability* or *disqualification* rests is no other than that principle which dictates that a person can not be both judge and party. He who *is entrusted with the business of others* can not be allowed to make that business a target for his own selfish greed, because, from the frailty of human nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is trustee. The danger

of temptation from the facility and advantages for doing wrong which a particular situation affords, does, out of the mere necessity of the case, work a *disqualification;* nothing less than incapacity being able to shut the door against temptation where the danger is imminent and the security against discovery great, as it must be where the difficulty of prevention or remedy is inherent to the very situation which creates the danger. *The wise policy of the law has, therefore, put the sting of a disability into the temptation as a defensive weapon against the strength of the danger which lies in the situation.* Buckles v. Lafferty, 2 Rob. (Va.), 302; Newton v. Fay, 10 Allan (Mass.), 505; Perry on Trusts, vol. 1, secs. 194 to 199; Scott v. Henry, 13 Ark., 112; Jones on Mortgages, vol. 1, secs. 711 and 712; Lea v. Pierce, 69 N. Car., 76; McLeod v. Bullard, 84 N. Car., 531; Fox v. Macreath, vol. 1, Leading Cases in Equity., 188; Richardson v. Spencer, 18 B. Mon., 465.

6. When, on the 13th day of February, 1892, the appellant paid off the $6,000.00 indebtedness, on account of which the 100 shares were transferred on October 16, 1891, he was entitled to an exoneration and release of that stock, and thereafter the said Jones held at least those 100 shares as simple trustee for appellant. Under the facts and circumstances of this case we claim that, in any event, the appellant is entitled to recover back, unconditionally, those one hundred shares, even if the court should conclude that the Jones estate might claim the remaining 500 shares in satisfaction of the indebtedness on account of which it was pledged.

7. As a matter of both law and fact, we earnestly insist that the appellant has clearly established the following averment of his petition to be true, to-wit:

"Plaintiff says that the said document of March 4, 1892, so far as it purports to evidence an absolute sale and final settlement of the matters between this plaintiff and the said Paul Jones, without any right of redemption to the plaintiff, was procured from him by the fraud, covin, imposition, misrepresentation, and deceit of the said Paul Jones, and was and is an unconscionable, illegal, fraudulent, and usurious instrument, and a perversion of the trust relations existing between this plaintiff and the said Paul Jones at that time; and the said paper does not represent the actual contract, intention, understanding, or agreement then entered into between this plaintiff and the said Paul Jones, and the same was and is inequitable, illegal and void." (Record, vol. 1, page 18.)

8. That when a pledgee claims from his pledgor a relinquishment or sale of his equity in the pledged property without having paid

Cunningham v. Jones' Exrs.

anything more therefor than the satisfaction of the old debt
secured by the pledge, the burden rests on the pledgee to show
by the clearest and most convincing proof that the transaction
was perfectly fair and for an adequate consideration, as well
as wholly untainted with any fraud and misrepresentation, and
that the same was voluntarily and intelligently given by the
pledgor.

Any advantage acquired by the pledgee over the pledgor in
obtaining the pledged property for less than others would have
given will be set aside. Peugh v. Davis, 96 U. S., 337; Brad-
bury v. Davenport, 55 Am. St., Reports, 109; Stoutz v. Rouse,
84 Ala., 309; Niggeler v. Maurin, 34 Minn., 118; Hyndman v.
Hyndman, 46 Am. Dec., 171; Shaw v. Walbridge, 33 Ohio St., 1;
Poemroy's Eq. Jur., sec. 1103.

9. "It is among the rudiments of the law that the same person can
not act for himself, and, at the same time, with respect to the
same matter, as the agent of another whose interests are con-
flicting. Thus, a person can not be a purchaser of property and
at the same time the agent of the vendor. The two positions
impose different obligations, and their union would at once raise
a conflict between interest and duty, and, constituted as human-
ity is, in the majority of cases, duty would be overborne in the
struggle. The law, therefore, will always condemn the trans-
actions of a party on his own behalf, when, in respect to the
matter condemned, he is the agent of others. He is not per-
mitted to occupy a position which will conflict with the interest
of a party who he represents and is bound to protect." Wardell
v. Railroad Company, 103 U. S., 658; Goodin v. Canal Company,
18 Ohio St., 182; Marsh v. Whitmore, 21 Wall., 183-4.

10. We earnestly contend that the judgment of the court below dis-
missing appellant's petition is not supported either by the law
or the evidence, and that it should be reversed, with directions
to award the appellant the said 600 shares of stock as of May
14, 1894, upon the payment of the $42,410.00 then tendered, with-
out any interest thereon after that date, and that appellees
should be compelled to account for all dividends received thereon.

Having made the foregoing preliminary statement of the points
in the case, we will next proceed to make a fuller and more
analytical statement and argument of the case.

HUMPHREY, BURNETT & HUMPHREY, Attorneys for appellees.

We have given the law in Kentucky and elsewhere, and the
facts in this record as a full and complete answer to every prop-

osition made in the summary of the brief for appellants; to endeavor to answer them, one by one, would be but to go over our brief.

We submit:

1. That the papers of January 24, 1891, and March 4, 1892, are simple, unambiguous, and signed by all parties voluntarily and understandingly.

2. That there is neither mistake, fraud nor vice in either of them.

3. That in Kentucky parol evidence is not admissible to add to them.

4. That if it were, the evidence shows conclusively that they are what they purport to be, one the evidence of a pledge, the other of a sale.

5. That there is no evidence here of fraud, oppression, or unfair dealing.

6. That Paul Jones and his memory are entirely undeserving of the epithets used, and that Cunningham's attack upon him shows that gratitude with him is simply "a lively apprehension of favors to come."

Parol evidence not admissible against the written paper. Munford v. Green's Administrator, 19 Ky. Law Rep., 1792.

Cunningham's opportunity to read paper. Watkins v. Rymill Law Rep., 10 Q. B. Div., 186; Spitze v. B. & O. R. R. Co., 32 Am. St. Rep., 386; May v. Johnson, 3 Ind., 44; Sanger v. Dun., 32 Am. Rep., 789, S. C. (47 Wis., 615); Wharton on Evidence, secs. 932 and 1243.

Authorities in Kentucky on the subject of parol evidence: Grant's Heirs v. Craigmiles, 1 Bibb, 205; Haden v. McIlvane, 4 Bibb, 58; Blanchard v. Kenton, 4 Bibb, 451; Trumbo v. Cartright, 1 Marshall, 582; Baugh v. Ramsey, 4 T. B. Mon., 156; Stone v. Ramsey, 4 T. B. Mon., 237; Thompson v. Patton, 5 Littell, 74; Skinner v. Miller, 5 Littell, 84; Lindley v. Sharpe, 7 Monroe, 252; Marshall's Admr. v. Cox, 7 J. J. Mar., 134; Thomas v. McCormack, 9 Dana, 109; Crutcher v. Muir's Executor, 90 Ky., 142; Harper v. Harper, 5 Bush, 177; Edrington v. Harper, 3 J. J. Mar., 555; Perkins v. Drye, 3 Dana, 170.

The law in other jurisdictions. Howland v. Blake, 97 U. S., 624; Coyle v. Davis. 116 U. S., 108; Cadman v. Peter, 118 U. S., 73; Voorhees v. Hennessey, 34 Pac. Rep., 931 (s. c., 7 Washington, 243); Barton v. Bank of New South Wales, Law Reports, 15 App. Cases, 381; Tygret v. Potter, 16 Ky. Law Rep., 810; Lance's Appeal, 4 Atl. Rep., 377 (s. c., 112 Pa. State, 456); Mahoney v. Bostwick, 31 Am. St. Rep., 180; Peagler v. Stabler, 91 Alabama, 308 (s. c ., 9 Southern, 158); Adams v. Pilcher, 92 Ala., 474 (s. c., 8 Southern, 757); Jones on Mortgages, 4th ed., sec. 267; Armor v. Spaulding, 23 Pac., 790 (14 Colorado, 302); Null

Cunningham v. Jones' Exrs.

v. Fries, 110 Pa. State, 521 (s. c., 1 Atlantic Rep., 551); Walker v. Farmers' Bank, 10 Atl. Rep., 99 (s. c., 8 Houston's, Delaware, 94); Walker v. Farmers' Bank, 14 Atl. Rep., 819 (s. c., 8 Houston's Delaware, 258); Downing v. The Woodstock Iron Co., 93 Ala., 261 (s. c., 9 Southern Rep., 177); Stoutz v. Rouse, 84 Ala., 312 (s. c., 4 Southern Rep., 170; Fisher v. Green, 31 N. E. Rep., 174 (142 Ill., 80); Barton v. Lynch, 23 N. Y. Supp., 217 (69 Hun, 1); Clifford v. Gates, 23 N. Y. Supp., 1085 (70 Hun., 597); Cake v. Schull, 16 Atl. Rep., 434 (45 N. J. Eq., 208); Rutherford v. Massachusetts Mutual Ins. Co., 45 Fed. Rep., 712; Appeal of Fisher, 132 Pa. St. Rep., 488 (19 Atl. Rep., 276); Langor v. Merservey, 80 Ia., 158 (s. c., 45 N. W. Rep., 732); Ensign v. Ensign, 120 N. Y., 655 (s. c., 24 N. E. Rep., 942); Story v. Springer, 39 N. E. Rep., 570 (155 Ill., 25); Etheridge v. Wisner, 86 Mich., 166 (s. c., 48 N. W. Rep., 1087); Wallace v. Smith, 155 Pa., 78 (25 Atl. Rep., 807); Hogan v. Jacques, 97 Am. Dec., 644 (19 N. J. Eq., 123); Baxter v. Willy, 31 Am. Dec., 623 (9 Vermont, 276); Corbett v. Smith, 71 Am. Dec., 431 (7 Iowa, 60); Ingram v. Illges, 13 Southern Rep., 548 (98 Ala., 511); Winston v. Burnell, 21 Am. St. Rep., 291 (44 Kansas, 367); Frink v. Adams, 36 N. J. Eq., 485.

No public policy forbids the purchase of the pledge by the pledgee. Manning v. Shriver, 28 Atl. Rep., 899 (79 Md., 41); Easton v. The German American Bank, 127 U. S., 538; Russell v. Southard, 12 Howard, 154.

No trust relation between pledgor and pledgee.    Lewin on Trusts (side p. 490); Jones on Mortgages (4th ed.), secs. 711, 712); Perry on Trusts, sec. 199; Bigelow on Fraud, pp. 135, 347; Jones on Pledges, sec. 555; Melbourne Banking Co. v. Brougham, Law Rep., 7 App. Cases, 315; Knight v. Majoribanks, 2 McNaughton & Gordon, 10; Montague v. Bell, 14 Ky. Law Rep., 890; Conway's Executors v. Alexander, 7 Cranch, 237.

Declarations    of    Dividends.    119    U.    S.,    304;    82    Ky., 376; 153 U. S., 497; 150 Pa. St., 118; Beach on Private Corporations, sec. 602; Cook on Stockholders, sec. 545; 99 Cal., 57; 96 Ala., 329; Morawetz on Corporations, sec. 448; 6 Ky. Law Rep., 588.

OPINION OF THE COURT BY JUDGE DURELLE—AFFIRMING.

Appellant, Cunningham, brought suit against the executors of Paul Jones, claiming that 600 shares of stock in the J. G. Mattingly Company, in the name of Paul Jones, were subject to redemption by him, and that on May 14,

1894, he had tendered to Jones $41,410 in redemption of the stock, and asked that Jones' executors be compelled to accept the money and turn over the stock. He had previously set up by a cross action the same claim in a suit by W. H. Thomas & Son, to which Cunningham and Jones were parties defendant, but so much of his pleading as set up the cross action was stricken out of the suit. At a sale at public auction by the assignee of the firm of J. G. Mattingly & Son, the distillery plant, including the brands of that firm, was purchased by W. H. Thomas, J. A. Cunningham, and Paul Jones for $125,000. Thereupon the J. G. Mattingly Company was incorporated, with a capital stock of $300,000, $250,000 of which was paid for the distillery plant, which was conveyed to the company, and the other $50,000 was agreed to be furnished, one-third by each, by the three incorporators, as working capital The assets of the corporation therefore represented $125,100 paid for the property, and $50,000 working capital, of which $100,000 was raised on the note of the corporation, indorsed by the corporators, and the remaining $75,000 was to be paid in cash. Thomas paid in his $25,000 in the spring of 1890; Cunningham paid in $20,000, which he obtained on the indorsement of his son-in-law, Mr Frank L. Powell; and Jones paid in $25,000 in cash. Cunningham did not pay in the remaining $5,000 due from him at that time, but carried a cash ticket in the drawer for $5,000 until June, 1891. The $100,000 note of the corporation was carried by the Kentucky National Bank until September, 1890, when payment was demanded. Jones thereupon paid his one-third of the amount. Thomas gave a note indorsed by Jones and Cunningham, which was discounted by the bank, and Jones executed to Cunningham two notes of $10,000 each,

and one for $15,000, which were discounted by the latter at the First National Bank, and the proceeds used in payment of his one-third. After this arrangement was made, the stock of the corporation was issued, 1,000 shares to each of the three corporators; and Cunningham thereupon indorsed his stock, and turned it over to Jones as security for the payment of the notes aggregating $35,000. Shortly thereafter, being threatened with a suit by a bank at Danville, Ill., he informed Jones of the fact; and Judge William Lindsay, being called in for consultation, prepared what is known in this case as the "Lindsay Paper," which speaks for itself:

"This paper is to show that, in order to enable James A. Cunningham to pay for (1,000) one thousand shares of the capital stock of the J. G. Mattingly Company of Louisville, Kentucky, I executed to him three certain promissory notes dated August 29, 1890,—one for ten thousand dollars, due in four months; one for fifteen thousand dollars, due in five months; and one for ten thousand dollars due in six months. Said notes were executed under and in virtue of an agreement that Cunningham was to discount them at the First National Bank of Louisville, and apply the proceeds to the payment for the said stock, and that I was to hold the said stock in lien to secure me against loss in case I should be compelled to pay off the said notes, or any part of the same; also, that I have paid off the two notes, respectively, in four and five months, and am still bound on the ten thousand dollar note due in six months. Now, pursuant to the said agreement, on the said 29th day of August, 1890, the said Cunningham transferred to me his certificate for the said one thousand shares of stock, to hold in lien as aforesaid. Afterwards, on December 5, 1890, with the consent of the said Cun-

ningham, I caused the certificate for the said one thous-
and shares of stock to be issued to myself. Now, on the
same day, with the consent and in obedience to the in-
structions of the said Cunningham, I surrendered the said
last-named certificate, and caused a certificate for one
share of the said stock to be issued to the said Cunning-
ham, and a certificate for (499) four hundred and ninety-
nine shares to Frank L. Powell, and (500) five hundred
shares to myself. These said five hundred shares I hold
in lien to secure the payment to me by the said Cunning-
ham of the amount of the two notes I have already paid
as aforesaid to the First National Bank, and to indemni-
fy me against loss on the note not yet due. For the sums
so paid I hold the two notes of the said Cunningham, one
dated December 30, 1890, for ten thousand dollars, due
four months after date, and the other for fifteen thou-
sand dollars, dated January 6, 1891, and due four months
after date; each note bearing seven per cent. interest from
date. Now, when the said Cunningham shall pay off and
discharge the said two notes, and each of them, and shall
hold me harmless and free from liability on the said
note for ten thousand dollars, not yet due, he is to be
entitled to the said five hundred shares of stock, and to
have the same transferred to him, or to such parties as
he may order or direct. [Signed] Paul Jones. Louis-
ville, Ky., January 24th, 1891.

"The within paper sets out fully and correctly the trans-
action therein mentioned. [Singed] J. A. Cunningham."

There can be no mistake as to what this paper means,
nor is there any dispute as to what it was intended to
mean.

Jones became president of the corporation, without
salary, and Cunningham was made general manager, at

a salary of $7,500 for the first year, and afterwards at
$300 per month, until September, 1892, at which time he
resigned. About June, 1891, in order to make good his
cash ticket of $5,000 in the drawer, his son-in-law, Mr.
Powell, accepted a draft for $6,000 to his order, which
was indorsed by him and Jones, discounted, and the pro-
ceeds used to pay the amount due by Cunningham to the
Mattingly Company, with interest from the time the
money should have been paid in. In October, Jones ex-
pressed a doubt as to whether he was sufficiently secured
for Cunningham's notes, all of which he had taken up at
their maturity, and notes in lieu thereof had been exe-
cuted by Cunningham to Jones for their amount, and re-
quested a transfer in addition of 200 shares of the 499
held by Powell. All of that stock, except 100 shares, had
been used as collateral in other transactions, but the 100
remaining shares were transferred and pledged to Jones.
The $6,000 draft was paid off by Cunningham in Febru-
ary, 1892. On March 4, 1892, the following paper was
drawn up:

"This memorandum of agreement between Paul Jones,
of the first part, and Frank L. Powell, of the second part,
and J. A. Cunningham of the third part, witnesseth as
follows: The said Jones holds three notes executed to
him by the said Cunningham,— one dated December 30,
1890, in the sum of $10,000, payable four months after
date; another dated January 6th, 1891, payable four
months after date, in the sum of $15,000; another dated
March 2, 1891, payable six months after date, in the sum
of $10,000. Each of said notes bears interest from its
date at the rate of seven per cent per annum. Calculat-
ing interest on the said notes at six per cent., and credit-

ing any interest which has been paid, there is still a large amount of interest due upon said notes, and no part of the principal of any of them has ever been paid. In order to secure payment of the said notes, the said Jones has a certificate for 500 shares of the capital stock of the J. G. Mattingly Company (being certificate No. 7), which was issued to him at the instance of the said Cunningham; and the said Jones has also, to secure the payment of the said notes, a certificate of 100 shares of stock in the same company (being certificate No. 10), and which was issued to him at the instance of the said Frank L. Powell. The value of said 600 shares of stock is not equal to the amount due upon the said notes, but it has been agreed between the parties hereto as follows: (1) The said Cunningham and the said Powell hereby release and quitclaim all of their interest in the said 600 shares of stock, and do now declare that the same does, from and after this date, belong absolutely to the said Paul Jones. (2) The said Paul Jones does hereby release the said Cunningham from the said notes, and from any and all obligation to pay the same, and does hereby declare them canceled. (3) This is to be taken as a full settlement of the matters herein set forth. In testimony whereof, the said Jones, Cunningham, and Powell have hereunto set their hands this 4th day of March, 1892. [Signed] Paul Jones. J. A. Cunningham. F. L. Powell."

At the same time with the execution of this paper the three notes were marked "Paid," were canceled and delivered to Cunningham, and Cunningham delivered to Jones his duplicate copy of the Lindsay paper. There can be no question about the meaning of this paper. Its meaning is as plain as the English language can make it. But it is claimed by Cunningham that the

Cunningham v. Jones' Exrs.

paper was procured by the fraud, covin, im-
position, misrepresentation, and deceit of Jones,
and was an unconscionable, illegal, fraudulent, usur-
ious instrument, and a perversion and illegal
abuse of the trust relations existing between Cunningham
and Jones at the time, and that it did not evidence the
actual contract, intention, understanding, or agreement
then entered into between them, and was inequitable, il-
legal and void. It is claimed that the incumbrance upon
Cunningham's stock shown by the Lindsay paper was the
sole consideration for the execution of the new paper;
that it was obtained solely by virtue of the influence of
that incumbrance; that the only consideration for the
transfer of the 100 shares was the indebtedness of $6,000,
which had been already paid; that on March 4th, the 600
shares of stock were worth more than double appellant's
indebtedness to Paul Jones; that at the time of its execu-
tion Jones represented to Cunningham that his right of
redemption should continue; that at various times he
made statements to the same effect to other persons, and
in December of the same year demanded of Cunningham
that he then redeem the stock; that at various times he
recognized the existence of a right of redemption; and
that the relations of trust and confidence existing between
the parties to this paper with regard especially to the
stock in controversy, with the other circumstances, show-
ed that Jones held the stock in trust for Cunningham. By
the acquisition of the 600 shares of stock, if this paper
is valid, Jones acquired a majority of the stock of the
corporation, and a controlling interest therein, at a cost
to him of about sixty-one cents upon the dollar of its face
value. There is considerable testimony directed by ap-
pellant to the proposition that the value of the stock

was greatly in excess of the amount of indebtedness canceled by the transfer of March 4, 1892. This testimony, in so far as it is convincing, tends to lessen the force of the argument that the Humphrey paper was obtained solely by virtue of the influence of the relationship of debtor and creditor existing between the parties; for, in so far as the value of the pledge at that time exceeded the amount for which it was in lien, so far was it rendered easier for the pledgor to obtain money for the purpose of redemption. It is not satisfactorily shown that the bargain set forth in the Humphrey paper was an unconscionable one, if therein truly set forth. It is true that in November, 1890, Jones declined an offer of .$125,000 for his 1,000 shares of stock; but the evidence tends strongly to show that in the fall of 1891 and spring of 1892 Jones did not regard the investment as a good one, and was willing to part with his interest for cost and interest, and that about that time he gave an option upon his interest at a slight advance upon that figure, and it is admitted by Cunningham that Jones approached him about getting a buyer at seventy-five cents on the dollar. It is unnecessary to go into the details of the evidence upon this branch of the case. It sufficiently appears that neither Jones nor Cunningham at or about the time of this transaction took as rosy a view of the situation of this speculative business as the subsequent history of the corporation might seem to warrant. It does appear that about this time the burden of financing the institution fell almost entirely upon Jones, and that he was weary of the business and anxious to retire from it, but was unable to do so. About this time he learned that he was sick with a mortal sickness. He communicated this fact to Cunningham; stating that he was in bad health, that he

thought of going abroad, and that the business was not in a shape satisfactory to him. Thereupon the Humphrey paper was executed. Granting that Jones knew he had a malady which must prove fatal, and that he desired to get his business in such shape that it could be easily managed, we are unable to see what advantage there was to him in the agreement which Cunningham claims was made. He had a continuing lien upon the stock pledged with him to secure the repayment of Cunningham's indebtedness. This he could enforce, not merely upon the 500 shares, but upon the 100 shares which Cunningham himself states were pledged both for the $6,000 draft and for the notes theretofore given. Why he should desire to transform this enforceable agreement into an agreement whereby Cunningham had the right to redeem, but no obligation to pay, we are unable to see, except upon the theory argued by counsel,—that he did it with the deliberate and set purpose of carrying out an elaborate scheme of fraud, of which we think there is no sufficient evidence. There are many circumstances detailed by the witnesses which tend to support the contention of Cunningham, but the physical facts of the transaction itself, together with the situation at the time the transaction took place, seem to us to rebut the presumption drawn by appellant's counsel. The new paper was executed both by Cunningham and his son-in-law. They had opportunity to examine it, and there is evidence that they did so. There is testimony to show that Powell regarded it as an absolute sale by Cunningham to Jones, and an extinguishment of Cunningham's debts to Jones. The Lindsay paper was given up, which up to that time had evidenced an indebtedness by Cunningham, with right of redemption, and a mere pledge of the stock to

secure that indebtedness. And finally the notes which
evidenced that indebtedness were marked "Paid," and
were canceled and delivered over to Cunningham as evi-
dence of the extinguishment of the indebtedness. Very
strong evidence of fraud should be required to overturn
so definite and so complete a transaction as this one.
Months before the next election of directors, Jones noti-
fied Cunningham that he intended to leave him out of the
directory. He could do this only by voting what Cun-
ningham claims to have been his stock. Cunningham ap-
pears to have been present at the meeting, and made no
objection to Jones turning him out of the directory. It
is, as said by the trial court, "incredible that Mr. Cun-
ningham and his son-in-law, Mr. Powell, should not have
understood this instrument, and the plain and unequivo-
cal terms in which it is couched. It was an absolute bill
of sale, extinguishing any right of redemption which the
pledgor theretofore held in said stock pledged as collat-
eral. The law did not forbid the pledgor and pledgee to
meet together, and for a sufficient consideration to enter
into such contract. . . . The legal presumption is
that the instrument is what it purports to be, and the evi-
dence in this case shows that the parties to the transac-
tion understood it and knew what they were doing, and
that instead of its being oppressive to the pledgor, Cun-
ningham, the transaction at the time was one which re-
lieved him from a debt which he could not pay, and to
satisfy which the collateral itself was insufficient." It
is hardly necessary to cite more than a few authorities
which we think sustain the conclusion we have reached:
Montague v. Bell, 14 Ky. Law Rep., 890; Spitze v. Rail-
road Co., 23 Atl., 307; (32 Am. St. Rep., 386); May v. John-

son, 3 Ind., 449; Sanger v. Dun, 47 Wis., 615 (3 N. W., 388); Blackwell v. Railroad Co., 16 Atl., 12 (32 Am. St. Rep., 789), 17 L R. A., 729).

The thanks of the court are due to counsel upon both sides, whose preparation of this case has been such as greatly to lighten the labors of the court in the consideration of a record which otherwise would have been a matter of enormous labor. The judgment is affirmed.

Petition for rehearing filed by appellant and overruled.